**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **JASON STORM,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 4:14cv2060 TCM** |
| ) | |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the

final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (the

Commissioner), denying Jason Storm's applications for disability insurance benefits (DIB)

under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental

security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b.  All matters are

pending before the undersigned United States Magistrate Judge with consent of the parties

pursuant to 28 U.S.C. § 636(c).

## Procedural History

Jason Storm (Plaintiff) applied for DIB and SSI in September 2011, alleging that he

became disabled on December 20, 2009, by left shoulder problems, Crohn's disease,[1]

attention deficit hyperactivity disorder (ADHD), agoraphobia, anxiety attacks, and major

---

[1]Crohn's disease is an inflammatory bowel disease that causes inflammation of the lining
of the digestive tract and can result in severe diarrhea, pain, fatigue, and weight loss.
Inflammatory Bowel Disease,
http://www.mayoclinic.org/diseases-conditions/inflammatory-bowel-disease (last visited Nov.
18, 2015).

depression. (R.[2] at 192-204, 240.) His applications were denied initially and after a hearing held in July 2013 and a supplemental hearing held in October 2013, both before Administrative Law Judge (ALJ) Raymond Souza. (Id. at 8-24, 30-80, 87-95.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby adopting his decision as the final decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, testified at the first hearing.

Plaintiff, then thirty-eight years old, testified that he completed the eleventh grade, did not get a General Equivalency Degree (GED), and can read and write. (Id. at 38.) He is right-handed. (Id. at 39.) He lives with his girlfriend and her seven-year old daughter. (Id. at 42-43.) His girlfriend has lost her job. (Id. at 43.) They live in a trailer behind her mother's house. (Id.) His girlfriend receives food stamps; he does not, and he has not applied for them or talked to anyone about receiving assistance. (Id. at 44-45.)

Plaintiff testified that he was let go from his last job, packing books, because of problems with his left shoulder. (Id. at 39.) After his shoulder was injured, he had no insurance to have it fixed. (Id. at 40.) Then, when applying for jobs he would disclose his shoulder problems and not get hired. (Id.) After he did have surgery on his shoulder, he was told the bones were improperly healing. (Id. at 42.)

Plaintiff has pain in his shoulder every day. (Id. at 45.) It is worse in the mornings when he gets up. (Id.) Any use of the shoulder aggravates his pain. (Id.) Also, his neck

---

[2]References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

always hurts.  (Id. at 46.)  His doctor has told him it is related to his shoulder problem.  (Id.)  The neck pain is aggravated by such chores as mowing grass.  (Id. at 47.)  His left hand is always numb. (Id. at 48.)

At this point in the hearing, a recess was called so Plaintiff could take his anxiety medication.  (Id.)  Shortly after the hearing was resumed, it was continued until October for lack of time.

At the supplemental hearing, Plaintiff testified that he, his girlfriend, her daughter, and her brother live with her mother.  (Id. at 66.-67.)

Plaintiff testified that he is taking Zanaflex, Abilify, clonazepam, and Pristiq for his anxiety and depression.  (Id. at 61.)  The medications make him sleepy and dizzy.  (Id. at 62, 69, 70.)  Because of the anxiety and depression, he has problems being around other people.  (Id. at 69-70.)

He has had reconstructive surgery on his left acromioclavicular (AC) joint.  (Id. at 63.)  He gets numb in that arm and has to use his right arm.  (Id. at 63, 71-72.)  He has neck pain when sitting in an automobile.  (Id. at 70.)  The pain is becoming worse.  (Id. at 71.)

Asked about his doctor's report that he can lift fifty pounds occasionally and twenty-five frequently with both arms, Plaintiff replied that he cannot and would "regret it if [he] tried."  (Id. at 64.)  He is taking pain medication, tramadol.  (Id.)  It helps "[a] little bit."  (Id.)  Asked to rate his pain from one to ten with ten being so bad that he has to go to the emergency room, Plaintiff said it was a six in the morning and a five after taking medication.  (Id. at 64-65.)

Describing his daily routine, Plaintiff testified that after a shower and a cup of coffee, he sometimes watches the news on television and tries to do some household chores. (Id. at 67, 68.) Because he has problems holding onto things and has dropped meals a few times, he is not allowed to cook. (Id. at 68.)

Plaintiff has a driver's license, but has problems driving. (Id. at 68.)

Denise Weaver, M.Ed., testifying as a vocational expert, classified Plaintiff's past work with Goodwill as a stock checker, apparel, as light work with a specific vocational preparation (SVP) level of two,[3] and as a material handler as heavy work with an SVP of 3. (Id. at 75.) She was then asked to assume a hypothetical claimant of Plaintiff's age, education, and work experience who can perform light work with frequent kneeling, stooping, crouching, balancing, crawling, handling of objects as gross or fine manipulation, fingering of objects, and reaching; occasional climbing of ramps or stairs; and no climbing of ropes, scaffolds, or ladders. (Id. at 75-76.) Also, this claimant must avoid moderate exposure to extreme cold and excessive vibration and concentrated exposure to wetness, humidity, and extreme heat. (Id. at 76.) The claimant must not use hazardous machinery or be exposed to unprotected heights. (Id.) The work the claimant can perform is simple with an SVP of one or two and involving only routine and repetitive tasks with occasional changes, no strict production quota, and only occasional interaction with coworkers. (Id.)

---

[3]"The SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation. 2 *Dictionary of Occupational Titles* [DOT] app. C at 1009 (4th ed. 1991)." **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010).

Asked if this claimant can perform any of Plaintiff's past relevant work, Ms. Weaver replied that he can perform the work of a stock checker, apparel. (Id.) He can also perform such jobs as those of a folding machine operator, garment sorter, and cafeteria attendant. (Id. at 77.)

If this hypothetical claimant is off-task for approximately 15 percent of the day, work is precluded. (Id.) If this claimant will have two or more unexcused or unscheduled absences each month, work is precluded. (Id. at 77-78.) If the claimant's ability to finger and manipulate is limited to occasional, the cited jobs will not be available. (Id. at 78.) The jobs that will be are those of a sandwich board carrier, usher, and ironer. (Id. at 79.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included documents generated pursuant to Plaintiff's applications, records from health care providers, and various assessments of his mental or physical capabilities.

On a Function Report, Plaintiff described his daily activities as getting his step-daughter ready for school, taking care of pets, cleaning and doing laundry, meeting his step-daughter at the bus stop, preparing her a snack, cooking dinner, helping bathe her, packing a lunch for his girlfriend, and playing games on the computer. (Id. at 270.) His pets include cats and dogs, and he is the only one who cares for them. (Id. at 271.) Shoulder and stomach pain disturb his sleep. (Id.) He has no problem with personal care tasks. (Id.) He does, however, need reminders to take his medications and to keep his medical appointments. (Id. at 272.) With difficulty, he is able to do chores. (Id.) It takes him most of the day to clean

the house.  (Id.)  Because of his anxiety problems, he does not go out alone and spends a lot of time at home.  (Id. at 273, 275.)  He shops for groceries and cleaning supplies once a week for a couple of hours.  (Id. at 273.)  He can walk no farther than a mile before having to rest for thirty minutes, cannot pay attention for even a minute, and does not follow verbal instructions well.  (Id. at 275.)  He follows written instructions better than verbal ones.  (Id.) His impairments adversely affect his abilities to lift, reach, climb stairs, remember, concentrate, complete tasks, understand, follow instructions, and get along with others.  (Id.) They do not affect his abilities to, inter alia, use his hands.  (Id.)  He has been laid off or fired from jobs due to confrontations about medical problems, including his job at Goodwill.  (Id. at 276.)  He does not get along well with authority figures.  (Id.) Because of his Crohn's disease, he has a fear of dying or being away from a restroom.  (Id.)

Plaintiff girlfriend completed a Function Report on his behalf.  (Id. at 262-69.)  Her answers generally mirror his with the exception of reporting that she helps him care for the pets.  (Id. at 263.)

Plaintiff worked for Goodwill Industries in 2007 and 2008.  (Id. at 208, 227.)  His annual earnings were $3,104.25 and $6,445.13, respectively.  (Id.)  On a Disability Report he described his work as stocker with Goodwill Industries as being for eight hours a day, five days a week.  (Id. at 241.)  On a Work History Report, he described the position of stocker as requiring that he lift no more than fifty pounds occasionally and ten frequently.  (Id. at 253.)  For an hour each day, he engaged in the listed exertional requirements, e.g., kneeling and reaching.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological order beginning in September 2009 when Plaintiff went to the Phelps County Regional Medical Center emergency room with complaints of shortness of breath when cooking at a restaurant. (Id. at 325-26.) He was diagnosed with hypoventilation and discharged within an hour. (Id. at 326.)

In January 2010, Plaintiff was seen by Margie Lange, R.N., at the Agape Clinic for complaints of continuing pain and decreased functioning in his left shoulder after sustaining an injury two years earlier. (Id. at 335-36.) He was not currently on any medications. (Id. at 335.) Ms. Lange noted that Plaintiff had sought a consultation with an orthopedist. (Id. at 336.) He was prescribed tramadol. (Id. at 336.)

Four months later, Plaintiff again consulted Ms. Lange, this time for anxiety. (Id. at 333-34.) He had been feeling tense and edgy. (Id. at 333.) He did not appear to be in acute distress, but "became slightly agitated as conversation progressed." (Id.) Life-style management techniques to control his anxiety were discussed. (Id. at 334.)

On September 2, Plaintiff was given a refill of tramadol. (Id. at 331-32.) He reported to Ms. Lange an increase in shoulder pain after he mowed the grass with a push mower. (Id. at 331.)

On September 23, Plaintiff went to the Medical Clinic at Owensville, complaining of confusion, nausea, and difficulty breathing. (Id. at 356.) He was diagnosed with general anxiety disorder and prescribed Vistaril. (Id.) He was also prescribed tramadol for his left shoulder pain. (Id.)

Plaintiff next sought medical attention on May 2, 2011. (Id. at 413-21.) He then had an intake evaluation for participation in Pathways Behavioral Health (Pathways). (Id. at 413-21.) Plaintiff reported being unable to work since his shoulder separated and he had no insurance to fix it. (Id. at 413, 420.) He further reported that he had a long history of depression and hypomania/mania. (Id.) Also, he had anger outbursts and impulsive spending spurts. (Id.) He displayed a flight of ideas and rapid, pressured, and tangential speech. (Id.) He had tried to commit suicide five to six years earlier by overdosing on medications; he currently had no suicidal or homicidal ideation. (Id.) He was given a provisional diagnosis of bipolar disorder, antisocial disorder, and a Global Assessment of Functioning (GAF) of 43.[4] (Id. at 413, 415-16, 420.) He was scheduled to be seen by a psychiatrist. (Id. at 413.)

Subsequently, Plaintiff underwent a psychiatric evaluation by Bhaskar Gowda, M.D. (Id. at 402-04, 422-25.) He was diagnosed with panic disorder with agoraphobia; major depressive disorder, recurrent; and ADHD. (Id. at 425.) He was prescribed Celexa (an anti-depressant), trazodone (an anti-depressant), and Vistaril and was to return in four weeks. (Id.) His GAF was 50. (Id.)

Plaintiff met with Dr. Gowda again on June 9. (Id. at 400-01.) He reported both feeling a little better and not coping well with his pain and restricted movements. (Id. at

_____

[4]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

400.) He had not yet taken his medications. (Id.) He was sleeping only three to four hours a night. (Id.) On examination, he had a neat appearance, adequate hygiene, normal speech, good insight and judgment, goal-directed thought processes, and a euthymic mood and affect. (Id.) He did not have any hallucinations or suicidal or homicidal ideation. (Id.) His diagnoses and GAF were unchanged; his prescriptions for trazadone and Celexa were renewed. (Id. at 400-01.)

Two weeks later, Plaintiff had a functional skills evaluation at Pathways. (Id. at 405-12.) The only difficulties listed were those relating to a lack of finances, e.g., Plaintiff did not have the funds to buy fuel for the car, and problems working due to his shoulder injury and Crohn's disease. (Id. at 406, 407, 411.)

Plaintiff informed Dr. Gowda when seeing him in July that he could not tolerate the Celexa because it made him nauseous and the trazadone, although initially helping him sleep, was now causing him to wake up during the night. (Id. at 398-99.) He was anxious and not coping well. (Id. at 398.) On examination he was as before. (Id.) The trazadone dosage was doubled; Neurontin was prescribed instead of Celexa. (Id. at 399.)

Plaintiff was reportedly doing a lot better on his medications when seen by Dr. Gowda on August 4. (Id. at 396-97.) There was no other change in his status, diagnoses, appearance, or prescriptions. (Id.)

Plaintiff returned to the Medical Clinic on August 22 for treatment of his shoulder pain. (Id. at 354.)

Four days later, Plaintiff had x-rays taken at the Hermann Area District Hospital of his left shoulder, revealing faint soft tissue calcifications inferior to the distal left clavicle. (Id. at 341.) Based on Plaintiff's report of a remote history of a prior left shoulder injury, a bilateral AC joint study was recommended. (Id.)

Plaintiff was seen on September 2 at the emergency room of the Medical Clinic for his complaints of fever, diarrhea, and chills. (Id. at 353.) He was diagnosed with a viral syndrome, prescribed Phenergan (prescribed to treat allergy symptoms) and Imodium A-D (prescribed to treat diarrhea), and told to follow a BRAT (bananas, rice cereal, applesauce, and toast) diet and to increase his intake of fluids. (Id.)

Six days later, Plaintiff informed Dr. Gowda that he was not sleeping well and was getting irritable and "snappy very quickly." (Id. at 394-95.) There were no changes to his diagnoses or GAF. (Id. at 394.) Abilify (an anti-psychotic medication) was added to his prescriptions. (Id. at 395.)

Plaintiff met with Gavin M. Vaughn, M.D., and Devin M. Tompkins, M.D., at the University Hospital Orthopedic Clinic on September 27 for an evaluation of his left shoulder pain. (Id. at 382-86.) Plaintiff explained that his left shoulder pain had begun six years earlier when he was in a fight and someone kicked him in the shoulder. (Id. at 383.) He had then gone to the hospital, had x-rays taken, had his arm placed in a sling, and had been told there was no need for any follow-up. (Id.) He had since lost his job as a roofer due to his shoulder difficulties. (Id.) On examination, he had a "notable visible prominence deformity of the left clavicle with it raised superiorly and a tinting of the skin distally at the AC joint."

(Id. at 384.)  His range of motion was limited in forward flexion and abduction.  (Id.)  He was notably tender to palpation over the distal clavicular joint and along the trapezius and scapular spine.  (Id.)  He reported a history of high blood pressure, arthritis, depression, a bleeding disorder, and Crohn's disease.  (Id. at 382, 384.)  He was to have a magnetic resonance imaging (MRI) of the shoulder and then meet with a Dr. Smith.  (Id. at 384.)

Plaintiff informed Dr. Gowda on October 6 that the trazodone was helping him sleep better and also that he was tired all day.  (Id. at 392-93.)  He was always anxious.  (Id. at 392.)  His dosage of Neurontin was decreased by two-thirds.  (Id. at 393.)

Five days later, Plaintiff met with Matthew Smith, M.D., and Clayton Nuelle, M.D., at the Orthopedic Clinic about his left AC joint separation.  (Id. at 375-81.)  X-rays revealed a notable AC joint separation with superior and posterior displacement of the clavicle.  (Id. at 377.)  The plan was for Plaintiff to undergo an open left AC joint separation repair with allograft[5] tendon.  (Id.)

On November 14, Plaintiff underwent left coracoclavicular ligament and AC joint reconstruction with allograft.  (Id. at 367-72.)  It was noted that he smoked one pack of cigarettes a day.  (Id. at 367.)  Two weeks later, he was seen at a follow-up visit by Dr. Nuelle.  (Id. at 365-66.)  He reported doing very well, although he still had some persistent pain that was, at its worst, a six to seven on a ten-point scale.  (Id. at 366.)  On examination, Plaintiff had some mild tenderness to palpation along the incision site, "but otherwise no

---

[5]An allograft is "[a] tissue graft from a donor of the same species as the recipient but not genetically identical."  Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/allograft (last visited Nov. 18, 2015).

major issues."  (Id.)  He was to keep the sling on at all times and not do any lifting or activities with the shoulder.  (Id.)  He was to return in two weeks.  (Id.)

Plaintiff reported to Dr. Gowda on December 1 that he became "irritable very quickly," was always anxious, and had low energy.  (Id. at 390-91.)  His anxiety and panic attacks were worse.  (Id. at 390.)  He had had left shoulder surgery two weeks earlier and had stopped all medications.  (Id.)  He was not following doctors' orders and was taking care of his house.  (Id.)  He was sleeping only three to four hours a night.  (Id.)  On examination, he was as before.  (Id.)  There were no changes in his diagnoses, GAF, or prescriptions.  (Id. at 390-91.)

On December 15, Slade Schalk, C.S.S., a Pathways community support specialist, visited Plaintiff at his home to discuss his medication compliance.  (Id. at 591-92.)  Finding Plaintiff to be lethargic, Mr. Schalk inquired if he had kept his follow-up appointment with the surgeon.  (Id. at 591.)  Plaintiff had not.  (Id.)  He had just taken his pain medication and was compliant with his medications.  (Id.)  He reported that his mood and sleep had improved since he had started taking his medications again.  (Id.)

Two weeks later, Plaintiff saw Dr. Gowda, complaining of being constantly anxious and edgy and worried about going to jail because he had not paid his child support.  (Id. at 589-90.)  His diagnoses and GAF were unchanged.  (Id.)  His Abilify dosage was increased and was to be taken at bedtime.  (Id. at 590.)  Plaintiff informed Mr. Schalk the same day that he had not yet arranged for transportation to his physical therapy appointment the next month, but he agreed to do so.  (Id. at 587.)

Mr. Schalk met with Plaintiff again on January 4, 2012, to discuss whether Plaintiff was still interested in vocational rehabilitation. (Id. at 585-86.) He was not until he talked to his attorney about his SSI application. (Id. at 585.) Plaintiff and his girlfriend reported that his mood had improved since he started taking his medications as prescribed. (Id.)

Six days later, Plaintiff was seen by Dr. Smith for a follow-up visit from his shoulder surgery. (Id. at 634-35.) Plaintiff had missed a few appointments for various reasons, but reported doing well in general. (Id. at 634.) He had not been working on range of motion exercises and was instructed on strengthening exercises. (Id. at 634-35.)

When visited by Mr. Schalk on January 11, Plaintiff appeared to be in good mood. (Id. at 583-84.) He was taking his medications. (Id. at 583.)

Two weeks later, however, Plaintiff told Dr. Gowda that he was feeling anxious and edgy because his girlfriend was cheating on him. (Id. at 581-82.) On examination, his mood and affect were anxious. (Id. at 581.) There was otherwise no change, including in his hygiene, which was again adequate. (Id. at 581-82.) When seen by Mr. Schalk the same day, Plaintiff was described as having poor hygiene and being upset about his girlfriend. (Id. at 579-80.) He was taking his medications as prescribed, but was also drinking. (Id. at 579.) He wanted to meet with a mental health counselor. (Id.)

The next day, he did. Diana Shoupe, L.P.C., reported that Plaintiff "bemoaned about not being able to find a job, but did not state what action he has taken to find one." (Id. at 577-78.) He was worried because his girlfriend was cheating on him and she provided the

income.  (Id. at 577.)  He rejected any of Ms. Shoupe's suggestions, including to return for therapy.  (Id.)

Plaintiff was in a good mood when Mr. Schalk visited with him on February 3.  (Id. at 572.)  He was taking medications as prescribed and had found a place to live if his girlfriend kicked him out.  (Id.)

Four days later, he reported to Dr. Smith that he was doing well and described his shoulder pain as a one to two on a ten point scale.  (Id. at 632-33.)  He was progressing in his strengthening.  (Id. at 632.)  He was going to vocational rehabilitation, but was having difficulty finding a position because he could not yet do heavy work.  (Id. at 632-33.)  On examination, "his range of motion [was] excellent."  (Id. at 633.)  He was to continue to progress in his strengthening and was to return in six weeks.  (Id.)

On February 16, Plaintiff met with Mr. Schalk and declined his offer to help him contact vocational rehabilitation for assistance in getting a job or work on obtaining his GED. (Id. at 573-74.)  He did not want a job because he preferred to get his SSI application approved and did not have time for GED classes because he was babysitting his girlfriend's daughter when she was at work.  (Id. at 573.)

One week later, Mr. Schalk went to Plaintiff's home to accompany him to his appointment with Dr. Gowda.  (Id. at 568-69.)  Plaintiff described his mood as poor and his status as being constantly tired.  (Id. at 568.)  He had obtained a car and was to put plates on it that day.  (Id. at 568.)  Meeting with Dr. Gowda, Plaintiff informed him that he was having trouble with his girlfriend and was depressed.  (Id. at 570-71.)  His diagnoses and GAF were

unchanged.  (Id.)  Trazodone was stopped; another antidepressant, Effexor, was added.  (Id. at 571.)  His other prescriptions were renewed.  (Id.)

Plaintiff informed Mr. Schalk on March 1 that he had not yet picked up the medications prescribed, but his mood had improved because he was getting along better with his girlfriend.  (Id. at 566-67.)  He wanted to wait to go to vocational rehabilitation until a final decision was made on his SSI application.  (Id. at 566.)  One week later, Plaintiff told him he was taking his medications and performing exercises to strengthen his shoulder.  (Id. at 564-65.)

Plaintiff returned to the Medical Clinic on March 12, complaining of trouble sleeping and with his left shoulder.  (Id. at 446.)  His hands and neck were still numb and the skin on his arms was not healing.  (Id.)  Plaintiff was put on an antibiotic and the results of his MRI were requested.  (Id.)

Plaintiff consulted Mohammad Choudhary, M.D., on March 25 about his almost-constant neck pain, which he described as progressing.  (Id. at 664-65.)  The pain was dull, became sharp with activity, was an eight on a ten-point scale, and radiated to his left arm more than the right.  (Id. at 664.)  Also, he had numbness and weakness in his left hand and arm.  (Id.)  Medications helped, but did not control his pain.  (Id.)  He reported anxiety and depression, but no mood swings.  (Id.)  On examination, he was alert, followed commands, was oriented to time, could perform simple arithmetic, and had fluent speech and intact comprehension.  (Id. at 665.)  His muscle tone and coordination were normal.  (Id.)  The muscle strength in his left handgrip and upper extremity was -5/5 and 5/5 in the rest of his

muscle groups.  (Id.)  His gait was normal.  (Id.)  Dr. Choudhary described Plaintiff's mood as depressed and his physical function as okay.  (Id.)  He started Plaintiff on Vicodin, Ultram (a brand form of tramadol), and Neurontin and ordered x-rays of his cervical spine and a nerve conduction study.  (Id.)  A study done two days later revealed mild bilateral carpal tunnel syndrome, worse on the right than the left.  (Id. at 661-63.)

Mr. Schalk spoke with Plaintiff by telephone on March 28.  (Id. at 563.)  Plaintiff explained that he had missed his appointment with Dr. Gowda because the medications caused him to sleep all the time.  (Id.)  Consequently, he had run out of medications a few days earlier.  (Id.)  Asked if he had used drugs or alcohol because his words were slurred, Plaintiff stated he did not and hung up.  (Id.)  Mr. Schalk then went to Plaintiff's home.  (Id. at 561-62.)  Plaintiff appeared "to be agitated, confused, and lethargic."  (Id. at 561.) Plaintiff explained he had trouble keeping appointments because he overslept.  (Id. at 562.) While Mr. Schalk was there, Plaintiff called the pharmacy and requested medication refills. (Id.)

Mr. Schalk returned the next day.  (Id. at 559-60.)  Plaintiff was in a good mood.  (Id. at 559.)

Plaintiff informed Mr. Schalk on April 6 that he had had his prescriptions filled and had been taking them.  (Id. at 557-58.)  His mood and sleep were good.  (Id. at 557.)  On April 12, Plaintiff reported that his sleep and mood were better because he was taking medications.  (Id. at 555-56.)  One week later, he reported that his mood and sleep were okay, but he was constantly tired.  (Id. at 553-54.)  His girlfriend was falling behind on her bills;

Plaintiff refused to apply for vocational rehabilitation until discussing it with his lawyer.  (Id. at 553.)

Plaintiff returned to Dr. Choudhary on April 23, reporting that his pain was manageable on the medications prescribed; however, he still had neck pain.  (Id. at 659-60.) On examination, Plaintiff was as before.  (Id. at 659.)  He was diagnosed with cervical radiculopathy and carpal tunnel syndrome, was continued on the three medications, and was to return in four weeks.  (Id. at 659-60.)

When meeting with Mr. Schalk on April 26, Plaintiff agreed to try vocational rehabilitation.  (Id. at 551-52.)  Plaintiff also saw Dr. Gowda the same day.  (Id. at 549-50.) He reported he was feeling much better and getting along well with his girlfriend.  (Id. at 549.)  His diagnoses and GAF were unchanged.  (Id. at 550.)  Neurontin was stopped; Vistaril was added.  (Id.)

Plaintiff told Mr. Schalk on May 2 that he had lost the forms for vocational rehabilitation; he found them during their meeting.  (Id. at 547-48.)  Mr. Schalk filled out the forms; Plaintiff promised he would mail them.  (Id. at 547.)

On May 17, Plaintiff told Mr. Schalk that he had run out of his medications a few weeks earlier and had lost the prescriptions; consequently, his mood and sleep were worse. (Id. at 545-46.)

The next day, Plaintiff expressed the same complaints to Dr. Choudhary as he had previously and additionally complained of difficulty remembering things and occasionally misplacing items.  (Id. at 657-58.)  As before, he was able to do simple arithmetic and was

oriented to time.  (Id. at 657.)  Dementia was to be ruled out.  (Id.)  His prescriptions were renewed.  (Id. at 658.)

When Mr. Schalk visited with Plaintiff on May 23, Plaintiff disclosed that he not been taking his medications because he did not have the $4 co-pay.  (Id. at 543-44.)  His girlfriend would get paid the next day and he would get the prescriptions filled then.  (Id. at 543.)  His neurologist had told him he had carpal tunnel syndrome in the right arm due to overcompensating for the left shoulder problem.  (Id.)  He and his girlfriend reported that his mood and sleep were fine.  (Id.)

As of June 6, Plaintiff still had not picked up his medications.  (Id. at 541-42.)  He would when his girlfriend got paid.  (Id. at 541.)  He had an appointment with vocational rehabilitation.  (Id.)  One week later, Plaintiff informed Mr. Schalk that he had tried to get his prescriptions, but they were not available because he had waited too long.  (Id. at 539-40.)  His telephone was disconnected, but Plaintiff hoped to get a job through vocational rehabilitation and get it turned back on.  (Id. at 539.)  His girlfriend had told him he has mood swings.  (Id.)

On June 18, Mr. Schalk went with Plaintiff to his vocational rehabilitation appointment.  (Id. at 537-38.)

Three days later, when consulting the providers at the Medical Clinic for a referral to a dermatologist, Plaintiff reported that he had run out of his psychiatric medications and had missed his appointment with his psychiatrist.  (Id. at 443.)  It was noted that the sores on

Plaintiff's forearms and the area behind his ears were caused by him picking on them. (Id.) He was given the referral. (Id.)

Plaintiff saw Dr. Choudhary on June 21; his diagnoses and prescriptions were unchanged. (Id. at 655-56.)

Plaintiff informed Mr. Schalk on June 27 that vocational rehabilitation had requested a letter from his doctor outlining what Plaintiff can and cannot do. (Id. at 535-36.) Plaintiff reported first that he had not applied for any jobs since leaving his last one and later that he had applied for two jobs but did not get an interview. (Id. at 535.)

Dr. Gowda met with Plaintiff the next day for the usual fifteen-minute session. (Id. at 533-34.) There were no changes in his examination findings or diagnoses. (Id. at 534.)

On July 5, Mr. Schalk accompanied Plaintiff to the Medicaid office to investigate why he had received a letter advising him he would lose his Medicaid by the next week. (Id. at 531-32.) Plaintiff had failed to complete and return the necessary paperwork. (Id. at 531.) The paperwork was turned in five days later. (Id. at 529-30.) On July 18, Plaintiff reported to Mr. Schalk that he was unable to hold a job because of his Crohn's disease. (Id. at 527-28.) He did not respond when informed that vocational rehabilitation had said he would need to have the disease treated and that he had Medicaid to do so. (Id. at 527.)

The next day, Plaintiff reported to Dr. Choudhary that the numbness and weakness in his left hand and arm were improving, but were still not back to normal. (Id. at 653-54.) He continued to have problems with a memory loss. (Id. at 653.) There were no changes in his examination findings, diagnoses, or prescriptions. (Id. at 653-54.)

When Mr. Schalk met with Plaintiff on July 26 to accompany him to Dr. Gowda's office, Plaintiff stated he would not agree to have his Crohn's disease treated so he could get a job through vocational rehabilitation. (Id. at 525-26.) Plaintiff explained that it would take too much time "to have to see 4 doctors per month." (Id. at 525.) He was taking his medications as prescribed. (Id.) Plaintiff informed Dr. Gowda that he was upset because vocational rehabilitation wanted more paperwork completed. (Id. at 523-24.) Plaintiff planned to see his gastroenterologist about his Crohn's disease. (Id.) There were no changes in his examination findings, diagnoses, GAF, or medications. (Id.)

Mr. Schalk woke Plaintiff up when visiting him at his home early in the afternoon of August 3. (Id. at 522.) Plaintiff had run out of his trazodone, but was taking his other two medications. (Id.)

On August 9, when Mr. Schalk pointed out to Plaintiff that vocational rehabilitation had requested that he see a doctor about his Crohn's disease because he had cited it as a reason he cannot work, Plaintiff responded that he did not have time to deal with vocational rehabilitation. (Id. at 520-21.) He had picked up his medications two days earlier; they made him "drowsy and tired." (Id. at 520.)

Dr. Choudhary's notes of Plaintiff's August 16 visit read much the same as those of the previous visits. (Id. at 651-52.) Plaintiff's work-up for dementia was still pending. (Id. at 652.)

Five days later, Plaintiff informed Mr. Schalk that he could not afford the gas to go to doctor appointments and did not want to use Medicaid transport, for which he did not have

to pay, because the last time he did so was when his girlfriend was cheating on him.  (Id. at 518-19.)  He yelled at Mr. Schalk.  (Id. at 518.)  "In regards to working [Plaintiff] reported 'I made my decision that I can't work.'"  (Id.)

On August 29, Plaintiff underwent the work-up for dementia, an electroencephalogram (EEG).  (Id. at 650.)  It was normal.  (Id.)

Plaintiff informed Mr. Schalk on September 13 that he not taken the medications prescribed by Dr. Gowda for over a month.  (Id. at 516-17.)  He was only taking pain medication prescribed by Dr. Choudhary.  (Id. at 516.)

Five days later, Plaintiff telephoned Mr. Schalk after getting angry and beating his girlfriend's pet pig for pulling up carpeting.  (Id. at 514-15.)  Plaintiff inquired about anger management.  (Id. at 514.)

Plaintiff  reported to Dr. Gowda on September 27 that he was having "explosive episodes," breaking things, acting impulsively, and displaying "extreme anger and physical aggression."  (Id. at 511.)  After being started on pain medications, he was coping well with the pain.  (Id.)  Plaintiff was diagnosed with major depressive disorder, recurrent, and intermittent explosive disorder.  (Id. at 512.)  The dosage of Abilify was doubled.  (Id.)  His examination findings and GAF were unchanged.  (Id. at 511-12.)

Mr. Schalk met briefly with Plaintiff at his home on October 11 to assist him with filing out annual paperwork.  (Id. at 509.)  He found it difficult to keep Plaintiff on topic because Plaintiff wanted to pay a computer game.  (Id.)  Plaintiff informed Mr. Schalk that

he did not want to be referred to another anger management specialist because he "ha[d] enough trouble with being home" to meet Mr. Schalk.  (Id.) it

On October 21, Plaintiff had a functional skills evaluation at Pathways.  (Id. at 596-603.)  Under the category labeled "Self Care," the "Yes" was marked for the questions whether he had significant difficulties or required assistance in caring for his own medical needs; handling correspondence, paperwork, and appointments; managing his finances; and participating in recreation and leisure activities.  (Id. at 596-98.)  Plaintiff's difficulties in the first, third, and fourth areas were due to a lack of finances.  (Id.)  His difficulties in the second area were due to memory problems.  (Id. at 598.)  It was noted that Plaintiff had reported to his counselor that he did not want to work and had applied for SSI.  (Id. at 597.)  Plaintiff had no significant difficulties in the categories of "Interpersonal Relations" or "Adaptation to Change."  (Id. at 599-602.)  In response to whether he had significant difficulty or required assistance in performing work or work-like activity, Plaintiff reported he had such due to his shoulder injury, Crohn's disease, and memory problems.  (Id. at 602.)  The counselor and Plaintiff were "both unsure of what [he] would like to work on as far as what [was] offered by" the rehabilitation services.  (Id. at 603.)

Mr. Schalk met with Plaintiff on October 25 to accompany him to Dr. Gowda's office.  (Id. at 508.)  Plaintiff reported that his bottle of tramadol had been stolen from his home.  (Id.)  He explained he would not be returning to the Medical Clinic at Owensville because they accused him of having a drug problem and refused to treat him for pain.  (Id.)

Five days later, Plaintiff informed Dr. Choudhary that he had had surgery on his left shoulder; however, there was no significant change in his shoulder pain and he continued to have difficulty raising his left arm and driving. (Id. at 645-49.) Neck and arm movements aggravated the pain. (Id. at 645.) His problems with numbness and weakness in his left hand and with his memory were unchanged. (Id.) His examination findings were also unchanged. (Id.) In addition to cervical radiculopathy and carpal tunnel syndrome, Plaintiff was diagnosed with shoulder pain. (Id.) A nerve conduction study of his upper extremities produced the same results as before. (Id. at 647-49.) Plaintiff's prescriptions were renewed. (Id. at 646.)

When seeing Mr. Schalk on November 1, Plaintiff reported he was doing okay with his mood and sleep; his girlfriend reported that he continued to occasionally have problems with his anger. (Id. at 507.) Plaintiff agreed, but noted that he had less problems when he took his medications. (Id.)

Five days later, Plaintiff met with Tawnyla Jerome, M.D., with Capital Region Physicians to establish care. (Id. at 612-15.) Specifically, he had complaints of a rash on both upper extremities, memory problems, genital warts, hemorrhoids, Crohn's disease, and shoulder problems. (Id. at 612.) He wanted to see a neurologist about the memory problems. (Id.) He had not seen anyone for his Crohn's disease since he was eighteen years old. (Id.) The pain in his shoulder had been present since he underwent surgery the year before and was worse when he engaged in manual labor. (Id.) Dr. Jerome noted that Plaintiff was trying to get disability based on his left shoulder pain and his frequent bowel

movements as a result of the Crohn's disease.  (Id. at 613.)  His medications included Abilify, Wellbutrin (an anti-depressant), Neurontin, tramadol, and Zanaflex (a muscle relaxer).  (Id.)  On examination, Plaintiff was cooperative, appropriate, and had good eye contact.  (Id. at 614.)  His affect, speech, gait, and coordination were normal.  (Id.)  He had a rash on his torso, arms, and legs.  (Id.)  He was to have some lab work done, was prescribed a cream for his rash, and was to return in three months or as needed.  (Id. at 612-13.)

Plaintiff informed Mr. Schalk on November 29 that he occasionally forgot to take his medications and occasionally had problems with his sleep and anger.  (Id. at 505-06.)

Plaintiff met with another Pathways counselor, William Morgan, C.S.S., M.S.W., on December 5 to discuss employment.  (Id. at 503-04.)  Plaintiff was in the process of replacing his floors.  (Id. at 503.)  He explained he was open to doing any job as long as it was part-time because "he [did] not want to mess up his disability case."  (Id. at 504.)  Plaintiff had applied at various employers, including those looking for dishwashers, and agreed to apply at one cited by Mr. Morgan.  (Id.)

The same day, Plaintiff had his Pathways annual assessment.  (Id. at 500-02.)  He smoked a pack of cigarettes a day.  (Id. at 501.)  He rated his depression, which he described as continuous, as a three.  (Id.)  He slept okay.  (Id.)  His speech was rapid; his concentration and memory were poor; his self-esteem was diminished.  (Id.)  He had been unable to work because of his shoulder injury.  (Id.)  The injury had been repaired and he was interested in seeking employment.  (Id.)

When being accompanied by Mr. Schalk to a medical appointment with Dr. Jerome, Plaintiff agreed that he needed to get a part-time job so he would not get upset with his girlfriend for spending her money as she wanted. (Id. at 497-98.)

Plaintiff informed Dr. Jerome that the cream given him had not helped his rash. (Id. at 609-11.) And, he wanted a referral for his Crohn's disease. (Id. at 609.) Dr. Jerome noted that there had been no significant change in his rash since his first visit. (Id.) She was to refer Plaintiff to a dermatologist and a gastroenterologist. (Id.)

Plaintiff met with Mr. Morgan again on December 12. (Id. at 495-96.) He had picked up an employment application but was unsure about how to complete it. (Id. at 495.) If he was accurate about his education and shoulder, he might not get the job; but if he lied, he might not either. (Id.) He considered working from home so he could be home with his step-daughter[6] and still earn some extra money. (Id. at 496.)

The next day, Plaintiff informed Dr. Gowda that he had been in an even mood and was constantly tired. (Id. at 491-94.) He was getting six to seven hours of sleep a night. (Id. at 491.) He was taking care of his house and animals. (Id. at 491.) There were no changes in the examination findings. (Id.) His diagnoses were major depressive disorder, recurrent; generalized anxiety disorder (GAD) and panic disorder with agoraphobia; his GAF remained at 50. (Id. at 493-94.)

---

[6]Plaintiff's step-daughter is sometimes referred to as his daughter in the medical records. For consistency and accuracy, the Court will only refer to the girl at issue as his step-daughter.

When seeing Dr. Choudhary on January 3, 2013, Plaintiff rated his pain as a three with medication.  (Id. at 643-44.)  There was no change in his diagnoses, but Zanaflex was added to his prescriptions instead of Vicodin.  (Id. at 644.)

Five days later, Plaintiff told Mr. Morgan that he had turned in the application but was not optimistic because he had been applying for jobs for five years without success.  (Id. at 487-88.)  And, his shoulder was causing him a lot of problems recently and he was essentially having to use only his right arm.  (Id. at 487.)  Plaintiff was interested in full-time work if that was all that was available, but wanted to stay in the same town or a nearby one.  (Id.)  He felt he could be a stocker at Wal-Mart regardless of the issue with his shoulder.  (Id. at 488.)

Plaintiff told Mr. Schalk on January 18 that he was awake at night cleaning and playing video games and was sleeping during the day.  (Id. at 485.)  His girlfriend worked at night.  (Id. at 487)

On January 24, Plaintiff reported to Mr. Morgan that he was doing okay.  (Id. at 483-84.)  He had completed an online employment application, but had not heard back.  (Id. at 483.)  The same day, he told Dr. Gowda that his mood fluctuations were worse.  (Id. at 481-82.)  He was easily irritated and snappy.  (Id. at 481.)  He had been taking care of his house and animals and sleeping six to seven hours.  (Id.)  His anxiety and panic attacks were better.  (Id.)  As usual, there were no side effects from his medications.  (Id.)  His Abilify dosage was increased; his Wellbutrin prescription was renewed.  (Id.)

On February 7, Plaintiff reported to Mr. Schalk that he had not yet had the prescription for the increased dose of Abilify filled because he did not have the money. (Id. at 479-80.) Regardless, he did not think the medications were helping. (Id. at 479.)

When seeing Plaintiff on February 11, Dr. Choudhary noted that Plaintiff was "also claiming he had difficulty finding job." (Id. at 641-42.) Plaintiff was taking his medications; there were no side effects. (Id. at 641.) His diagnoses, examination findings, and prescriptions were unchanged. (Id. at 641-42.)

The next day, Plaintiff met with an anger management counselor, John Allen, B.A., C.S.S. (Id. at 477-78.) Plaintiff reported having a bad temper; he would get angry in the morning and then calm down when his step-daughter told him to stop yelling. (Id.)

Plaintiff was examined on February 20 by Barbara Dixon Scott, M.D., prior to having a diagnostic colonoscopy. (Id. at 618-21, 628-29.)

Eight days later, he informed Mr. Schalk that he was taking his medications as prescribed, but they made him "'feel like a zombie.'" (Id. at 473-74.)

On March 12, Plaintiff informed Mr. Allen that he had stopped taking his medications. (Id. at 471-72.) He wanted to work but was applying for disability. (Id.) He was working on calming down when he started to get angry. (Id.) The same day, Plaintiff met with Mr. Schalk. (Id. at 469-70.) He told him he *was* taking his medications as prescribed but was still getting angry. (Id.) He thought he should be prescribed something for ADHD. (Id. at 469.) He was considering seeing a different psychiatrist because Dr. Gowda was not helping. (Id.)

The colonoscopy revealed large internal hemorrhoids. (<u>Id.</u> at 625-27.) Dr. Jerome informed Plaintiff of the results. (<u>Id.</u> at 606-08.) At his request, Plaintiff was referred to a surgeon. (<u>Id.</u> at 606.)

Plaintiff reported to Dr. Choudhary on March 19 that he was depressed, tired, not sleeping well, and under a lot of stress. (<u>Id.</u> at 639-40.) He could not find a job. (<u>Id.</u> at 639.) There were no changes in his examination findings, diagnoses, or prescriptions. (<u>Id.</u> at 639-40.)

When visited at his home in the early afternoon on March 26 by Mr. Allen, Plaintiff had been sleeping on a mattress on the floor and had just woken up. (<u>Id.</u> at 465-66.) Plaintiff became more and more agitated as the meeting progressed and had to be calmed down as he was being hateful to his girlfriend in front of her daughter. (<u>Id.</u> at 465.)

Plaintiff was sleeping when Mr. Schalk arrived at his home on April 4 to accompany him to Dr. Gowda's office. (<u>Id.</u> at 461-62.) Plaintiff reported to Dr. Gowda that his mood fluctuations were getting worse. (<u>Id.</u> at 463-64.) His finances and the rash on his arms were also getting worse. (<u>Id.</u> at 463.) His examination findings, GAF, and diagnoses were the same. (<u>Id.</u>) His dosage of Abilify was increased; Wellbutrin was stopped; Pristiq, trazodone, and clonazepam were also prescribed. (<u>Id.</u> at 464.)

The same day, Plaintiff had a healthcare screen at Pathways. (<u>Id.</u> at 459-60.) He reported he was in chronic pain, which was moderate in his shoulders and knees. (<u>Id.</u> at 459.) He smoked one pack of cigarettes a day. (<u>Id.</u>) He had a hearing loss in both ears. (<u>Id.</u>) He

lifted weights, but had no energy. (Id.) Also, he had arthritis in his joints and recurring back pain. (Id.)

Plaintiff reported to Mr. Schalk on April 18 that he was taking his medications as prescribed; the clonazepam was helping with his mood, sleep, and anger issues. (Id. at 455-56.)

On April 23, Plaintiff reported to Mr. Allen that he was feeling okay, but was having difficulty sleeping at night. (Id. at 453-54.) He would be doing fine and then suddenly become very angry. (Id. at 454.) He was stressed about finances and the lack of a job. (Id.)

On May 2, Plaintiff again informed Mr. Schalk that the prescribed medications from Dr. Gowda were helping with his mood, sleep, and anxiety. (Id. at 452.) He wanted to hold off on getting a job because his lawyer thought he would get disability based on his health problems. (Id. at 451.) Plaintiff reported to Dr. Gowda the same day that he was feeling much better and getting along well with his girlfriend, although he was under a lot of stress because his girlfriend lost her job. (Id. at 449-50.)

Plaintiff rated his pain as an eight when he saw Dr. Choudhary on May 17. (Id. at 637-38.) He also reported that his medications were helping him and that his pain was manageable. (Id. at 637.) He had no side effects with the medications. (Id.) Shoulder pain was not included in his diagnoses. (Id.) A brace was prescribed for his carpal tunnel syndrome. (Id. at 638.) Otherwise, his examination findings and treatment were as before. (Id. at 637-38.)

Five days later, Mr. Schalk pointed out to Plaintiff that the doctor did not find Crohn's disease after the colonoscopy was performed and that Plaintiff could request another referral to a gastroenterologist. (Id. at 702-03.) Plaintiff responded that his girlfriend had found another job, they were paid up on their bills, and he was not currently worried about their finances. (Id. at 702.) His shoulder pain and Crohn's disease made him contemplate suicide daily. (Id.) As coping mechanisms, Plaintiff talks with his girlfriend and plays games on the computer. (Id.) Friends had told him his health will improve if he receives disability. (Id.) Plaintiff was taking his medications as prescribed; they were helping with his anxiety. (Id. at 702-03.)

Plaintiff and Mr. Allen met on May 28 to discuss coping mechanisms to reduce anger. (Id. at 700-01.)

When Mr. Schalk accompanied Plaintiff to Dr. Gowda's office on May 30, Plaintiff informed him he was sleeping too much because of the Klonopin (the brand name for clonazepam), although it helped with his anger and anxiety. (Id. at 696-97.) To Dr. Gowda, Plaintiff reported feeling much better on the medications. (Id. at 698-99.) He was under a lot of stress because his girlfriend had lost her job. (Id. at 698.) His dosage of Klonopin was reduced. (Id. at 699.)

On June 27, Mr. Schalk again accompanied Plaintiff to Dr. Gowda's office. (Id. at 692-93.) Dr. Gowda reported that Plaintiff had a hard time finding a job and was not motivated to do any job. (Id. at 690-91.) There were no medication side effects. (Id. at 690.)

The only change to his examination findings was a description of Plaintiff's insight and judgment as being poor. (Id. at 691.)

Plaintiff described his pain as an eight when seeing Dr. Choudhary on July 3. (Id. at 710-11.) There was no change in his examination findings; however, a brace for his carpal tunnel syndrome was not listed. (Id. at 711.)

When going to Plaintiff's house on July 26 to discuss anger management, Mr. Allen noted that Plaintiff was playing a video game when he arrived. (Id. at 682-83.) In August, Plaintiff informed Mr. Allen that he was doing okay and sleeping better. (Id. at 678-79.)

The notes of Plaintiff's visit to Dr. Choudhary on September 3 read as the previous ones. (Id. at 708-09.)

Two days later, Plaintiff informed Dr. Gowda that he was feeling better, was not working, and was helping his girlfriend around the house. (Id. at 672-73.) He had no motivation to be gainfully employed and had a hard time finding a job. (Id. at 672.) There were no medication side effects. (Id.) His insight and judgment remained poor. (Id. at 673.)

When seeing Plaintiff on October 8, Dr. Choudhary informed him that the nerve conduction studies had shown bilateral carpal tunnel syndrome which was moderate in his right hand and mild in his left. (Id. at 707.) Plaintiff was continued on his medications. (Id.)

Also before the ALJ were assessments of Plaintiff's physical and mental residual functional capacities.

In December 2011, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Kyle DeVore, Ph.D. (Id. at 429-40.) Plaintiff was assessed

as having an affective disorder, i.e., Bipolar I Disorder, an anxiety disorder, and a personality disorder. (Id. at 429, 433, 434.) These disorders resulted in no restrictions in his daily living activities and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Id. at 437.) They did not cause any repeated episodes of decompensation of extended duration. (Id.)

On a Mental Residual Functional Capacity Assessment form, Plaintiff was assessed as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 426.) In the area of sustained concentration and persistence, he was moderately limited in four of the eight listed abilities – (i) carrying out detailed instructions, (ii) maintaining attention and concentration for extended periods, (iii) working in coordination with or proximity to others without being distracted by them, and (iv) completing a normal workday and workweek without interruptions for psychologically based symptoms – and was not significantly limited in the other four abilities. (Id. at 426-27.) In the area of social interaction, Plaintiff was moderately limited in three of the five abilities, i.e., (i) interacting appropriately with the general public, (ii) accepting instructions and responding appropriately to criticism from supervisors and (iii) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and was not significantly limited in the other three abilities. (Id. at 427.) In the area of adaptation, he was moderately limited in his ability to respond appropriately to changes in the work setting and was not significantly limited in the remaining three. (Id.)

That same month, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by Ron Selinger, a single decision-maker.[7]  (Id. at 81-86.)  The primary diagnosis was separation of the AC joint; the secondary diagnosis was history of Crohn's disease.  (Id. at 81.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and, stand, walk, or sit for approximately six hours in an eight-hour day.  (Id. at 82.)  His ability to push or pull was otherwise unlimited.  (Id.)  He had postural limitations of only occasionally balancing, stooping, kneeling, crawling, crouching, and climbing ramps, stairs, ladders, ropes, or scaffolds.  (Id. at 83.)  He had no manipulative, visual, communicative, or environmental limitations.  (Id. at 83-84.)

In June 2013, Dr. Choudhary completed a Medical Source Statement - Physical on Plaintiff's behalf.  He concluded that Plaintiff can frequently lift or carry twenty-five pounds, occasionally lift or carry up to fifty pounds, continuously stand or walk for two hours, stand or walk throughout the day for six hours, sit continuously for four hours, and sit throughout the day for six hours.  (Id. at 667.)  His ability to push and pull was limited by his neck pain. (Id.)  He was to only occasionally climb, reach, handle, finger, and feel.  (Id. at 668.)  He should avoid moderate exposure to extreme cold, vibrations, hazards, and heights.  (Id.)  He should avoid concentrated exposure to extreme heat, weather, wetness, humidity, dust, and

---

[7]See 20 C.F.R. § 404.906 (defining role of single decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

fumes.  (Id.)  His need to lie down during the day to alleviate his symptoms was variable, both in frequency and duration.  (Id.)  His pain medication could cause a decrease in his concentration and attention.  (Id.)

Dr. Gowda completed a Medical Source Statement – Mental on Plaintiff's behalf.[8] (Id. at 669-70.)  He assessed Plaintiff's limitations in the area of understanding and memory as did Dr. DeVore, i.e., he was moderately limited[9] in one ability and not significantly limited in the other two.  (Id. at 669.)  In the area of sustained concentration and persistence, Plaintiff was moderately limited in five of the eight listed abilities, including (i) performing activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (ii) sustain an ordinary routine without special supervision; and (iii) make simple work related decisions.  (Id. at 669-70.)  As did Dr. DeVore, Dr. Gowda also found that Plaintiff was moderately limited in his abilities to (iv) work in coordination with or proximity to others without being distracted by them and (v) complete a normal workday and workweek without interruptions from psychologically based symptoms.  (Id.)  He was not significantly limited in the other three abilities.  (Id. at 669.)  In the area of social interaction, Plaintiff was moderately limited in two of the five abilities:  (i) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes and (ii) maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness.  (Id. at

---

[8]The month, August, and the date, the 23rd, the form was signed are legible; the year is not.  The parties both refer to the year as "2013."

[9]The form defines "moderately limited" as "[i]mpairment levels are compatible with some, but not all, useful functioning."  (Id. at 669.)  This rating is the second least severe of the four ratings.

670.)  He was not significantly limited in the other three abilities.  (Id.)  In the area of adaptation, he was moderately limited in his ability to set realistic goals or make plans independently of others and was not significantly limited in the remaining three abilities. (Id.)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through June 30, 2014, and has not engaged in substantial gainful activity since his alleged disability onset date.  (Id. at 13.)

He next found that Plaintiff had severe impairments of left AC separation, Crohn's disease, ADHD, anxiety, and depression.  (Id.)  He did not have an impairment, or combination thereof, that met or medically equaled an impairment of listing-level severity. (Id. at 13-14.)  Addressing Plaintiff's mental impairments, the ALJ found that Plaintiff had no restrictions in his activities of daily living, noting that he cared for himself, his step-daughter, and his pets and performed "common household chores."  (Id. at 14.)  Any restrictions on his activities in this area were caused by his physical impairments, not mental. (Id.)  Plaintiff had moderate difficulties in social functioning.  (Id.)  Such difficulties were demonstrated in his history of altercations and his anger control problems.  (Id.)  Plaintiff also had moderate difficulties in his concentration, persistence, and pace.  (Id.)

The ALJ then determined that Plaintiff has the residual functional capacity (RFC) to perform light work with additional limitations of avoiding unprotected heights, hazardous machinery, and climbing ropes, ladders, and scaffolding; avoiding concentrated exposure to

extreme heat, wetness, and humidity; and avoiding moderate exposure to extreme cold and excessive vibrations. (Id. at 15.) Plaintiff can frequently reach and reach overhead with the left upper extremity and can frequently manipulate and finger. (Id.) He was limited to simple, routine, and repetitive tasks that did not have a strict production quota with the emphasis on a per shift and not a per hour basis. (Id.) He could be around coworkers throughout the day, but was limited to only occasional interaction with them. (Id.)

When assessing Plaintiff's RFC, the ALJ also evaluated his credibility, and found him not entirely credible. (Id. at 16-22.) For instance, Plaintiff's statements were inconsistent with his ability to participate, respond, and pay attention at the hearing. (Id. at 21.) His statements were also inconsistent with the objective medical evidence and his daily activities. (Id. at 21-22.) And, "[t]here [was] also some evidence which suggests that [his] failure to participate in substantial gainful activity may be attributable to reasons other than his impairments." (Id. at 22.) And, some statements were inconsistent, e.g., whether he had applied for jobs. (Id.)

The ALJ gave partial weight to the opinion of Dr. DeVore, finding it to be generally consistent with the objective evidence except for his conclusions about Plaintiff's limitations in working with the general public. (Id. at 20.) The ALJ noted that Dr. Gowda had concluded otherwise. (Id.) The opinion of Dr. Gowda was given significant weight. (Id.) The ALJ noted that Dr. Gowda had found Plaintiff to have no more than moderate limitations in any area and to have no significant limitations in several work-related limitations, e.g., his ability to remember work-like procedures and to understand and remember short and simple

- 36 -

instructions.  (Id. at 20-21.)  Detracting from Dr. Gowda's opinion were the checkbox format of that opinion and the lack of any narrative explanation.  (Id. at 21.)  The opinion of Dr. Choudhary was given partial weight.  (Id.)  His findings about Plaintiff's ability to manipulate and finger were inconsistent with the objective medical evidence, e.g., Plaintiff having only mild weakness in his hand grip.  (Id.)

With his RFC, Plaintiff can perform his past relevant work as a stock checker.  (Id. at 22.)  Alternatively, there ae other jobs Plaintiff can perform, as cited by the vocational expert.  (Id. at 23.)

The ALJ then concluded that Plaintiff is not disabled within the meaning of the Act. (Id. at 23.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A"severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "'[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Id.** (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011). "'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner

may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).

## Discussion

Plaintiff argues that the ALJ erred when weighing the opinions of Drs. Gowda and Choudhary.

Both Drs. Gowda and Choudhary are treating specialists; Dr. Gowda is a psychiatrist and Dr. Choudhary is a neurologist. See 20 C.F.R. §§ 404.1527(d)(5) and 416.927(d)(5) (requiring that generally more weight be given to the opinion of a specialist than to that of

another acceptable medical source).  The ALJ gave significant weight to Dr. Gowda's medical source statement and partial weight to that of Dr. Choudhary.

The mental limitations incorporated by the ALJ into his RFC findings include limiting Plaintiff to simple, routine, and repetitive tasks without a strict production quota and to occasional interaction with coworkers, although he could be around coworkers throughout the day.  Dr. Gowda found Plaintiff to be moderately limited in his abilities to (a) understand and remember detailed instructions; (b)(i) perform activities within a schedule, (ii) maintain regular attendance, and (iii) be punctual within customary tolerances ; (c) sustain an ordinary routine without special supervision; (d) make simple work related decisions; (e) work in coordination with or proximity to others without being distracted by them; (f) complete a normal workday and workweek without interruptions from psychologically based symptoms; (g) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (h) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (i) set realistic goals or make plans independently of others.  The ALJ's restriction of simple, routine, and repetitive tasks with no strict production quota recognized Dr. Gowda's assessment as to (a), (b)(i), (c), (d), and (i).  His restriction to Plaintiff having only occasional interaction with his coworkers recognized Dr. Gowda's assessment as to (e), (g), and the portion of (h) referring to maintaining socially appropriate behavior.  Arguably, the ALJ did not incorporate into his RFC findings Dr. Gowda's assessment of Plaintiff's limitations as to (b)(ii), (b)(iii), (f), and that portion of (h) referring to Plaintiff's hygiene.

Between May 2011 and August 2013, when he completed the statement, see note 8, supra, Dr. Gowda met with Plaintiff twenty times. With the exception of the first meeting, the sessions generally lasted fifteen minutes. With the exception of the June 2013 session, Plaintiff's insight and judgment were described as good. Without exception, his appearance was neat, his hygiene was adequate, his speech was normal, his thought process was goal-directed, and his GAF was 50. A diagnosis of major depressive disorder, recurrent, was constant. He was also usually diagnosed with panic disorder with agoraphobia and ADHD. Once, those diagnoses were replaced with one for intermittent explosive disorder. Another time he was diagnosed with generalized anxiety disorder and not with ADHD. Throughout the sessions, Plaintiff's report of his mood varied. He could be doing better, not coping well, anxious, depressed, irritable, in a worse mood, or in an even mood. The session before Dr. Gowda completed the statement, Plaintiff was described as not being motivated to look for a job. Throughout this period, he generally declined any effort to assist him with vocational rehabilitation and sporadically applied for jobs.

"A treating [specialist's] opinion is generally given controlling weight, but is not inherently entitled to it." **Hacker v. Barnhart**, 459 F.3d 934, 937 (8th Cir. 2006). Rather, "[f]or [the] opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be 'inconsistent with other substantial evidence in [the] case record.'" **Id.** (quoting 20 C.F.R. § 404.1527(d)(2)) (second alteration in original). See also 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (listing "[s]upportability" as a factor to be considered when weighing medical opinions). Inconsistencies may diminish

or eliminate weight given opinions.  **Hacker**, 459 F.3d at 937.  See also **Papesh v. Colvin**, 786 F.3d 1126, 1132 (8th Cir. 2015) (holding that a treating physician's opinion "may have 'limited weight if it provides conclusory statements only, or is inconsistent with the record'") (quoting Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007)).

Dr. Gowda's treatment records do not support his opinion that Plaintiff was moderately limited in his ability to maintain basic standards of neatness and cleanliness.  Those records consistently refer to Plaintiff as having a neat appearance and adequate hygiene.  Moreover, Dr. Gowda's treatment records and the visit notes of Mr. Schalk, whose duty relative to Plaintiff was medication management, often refer to Plaintiff's failure to take the medications prescribed by Dr. Gowda.  "'[A] claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight.'" **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010) (quoting Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008)) (alteration in original); accord **Bernard v. Colvin**, 774 F.3d 482, 487 (8th Cir. 2014). Accordingly, the ALJ could properly consider Plaintiff's noncompliance when determining what weight to give Dr. Gowda's opinion that Plaintiff was moderately limited in his abilities to maintain regular attendance, be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms.

The ALJ also properly considered the checkbox format of Dr. Gowda's assessment and its lack of any explanation for the conclusions as to Plaintiff's limitations.  See **Anderson v. Astrue**, 696 F.3d 790, 794 (8th Cir. 2012) (noting that the court has "recognized that a

conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration'") (quoting <u>Wildman</u>, 596 F.3d at 964).

Additionally, as noted by the Commissioner, the ALJ did give Dr. Gowda's opinion significant weight. A treating physician's opinion "'should not ordinarily be disregarded and is entitled to substantial weight'" even if not entitled to controlling weight. **Papesh**, 786 F.3d at 1132 (quoting <u>Samons v. Astrue</u>, 497 F.3d 813, 818 (8th Cir. 2007)). The adjective "significant" means "[s]ufficiently great or important to be worthy of attention; noteworthy; consequential; influential." <u>Oxford English Dictionary</u>, http://www.oed.com/view/Entry/179569?redirectedFrom=significant (last visited Nov. 24, 2015). One definition of "[s]ubstantial" is "of real significance." <u>Oxford English Dictionary</u>, http://www.oed.com/view/Entry/193050?redirectedFrom=substantial (last visited Nov. 24, 2015).

Plaintiff correctly notes that one of the jobs the ALJ determined he can perform, that of a cafeteria attendant, *Dictionary of Occupational Titles* (DOT) 311.677-010, requires public interaction. The only public interaction required for a cafeteria attendant, however, is serving, and that is considered to be "not significant." *DOT*, 1991 WL 672694 (G.P.O. 1991). Alternatively, the ALJ also found he can perform his past relevant work as a stocker or a job as a garment sorter or folding machine operator. The public interaction required of a garment sorter is helping and taking instructions; this portion of the job is "not significant." *DOT*, 222.687-014, 1991 WL 672131 (G.P.O. 1991). The public interaction required of a

folding machine operator is the same as that of a garment sorter. *DOT*, 208.685-014, 1991

WL 671754 (G.P.O. 1991).

Plaintiff next argues that the ALJ erred by giving only partial weight to the opinion of

Dr. Choudhary limiting him to occasional reaching, handling, fingering, and feeling. The

criteria set forth above for weighing Dr. Gowda's opinion applies to that of Dr. Choudhary.

Dr. Choudhary's opinion about Plaintiff's manipulative abilities is not, as required, "supported

by medically acceptable laboratory and diagnostic techniques" and is "not . . . 'inconsistent

with other substantial evidence in [the] case record." **Hacker**, 459 F.3d at 937 (internal

quotations omitted). For instance, the only nerve conduction study performed before Dr.

Choudhary completed the medical source statement revealed *mild* bilateral carpal tunnel

syndrome, worse on the right than the left. The month before that statement, Dr. Choudhary

prescribed a brace for Plaintiff's right carpal tunnel syndrome. The month following the

statement, the brace was not prescribed. On examination, Dr. Choudhary consistently found

Plaintiff to have -5/5 muscle strength in his left handgrip and upper extremity and 5/5 in the

rest of his muscle groups.[7] See **Wright v. Colvin**, 789 F.3d 847, 853 (8th Cir. 2015)

(rejecting claimant's argument that the ALJ had erred in discounting physician's report that

he could not stand for long due to degenerative condition in lower extremities when studies

revealed that he had 5/5 muscle strength in those extremities). And, the records of Mr. Schalk

---

[7]Muscle strength is measured on a five-point scale, with 5/5 being that the muscle is functioning normally and can maintain its position when maximum resistance is applied and 0/5 being that the patient had no visible or noticeable contraction in a specific muscle. Brett Sears, Muscle Strength Measurement, http://physicaltherapy.about.com/od/orthopedicsandpt/a/strengthmeasurement.htm (last visited Nov. 14, 2015). The strength may be graded in half increments with a + or - sign. Id.

reflect a continuing ability to play video games. Indeed, Plaintiff used computer games as a coping mechanism and cut one visit short in order to engage in such. When applying for DIB and SSI, Plaintiff did not include the use of his hands as an ability adversely affected by his impairments or list any restrictions in the use of his hands as a disabling impairment.

Plaintiff contends that the ALJ improperly failed to consider Plaintiff's statements following his shoulder surgery and his testimony about his manipulative limitations. The ALJ found, however, that Plaintiff was not credible. This finding is not challenged.

Nor did the ALJ fail by not discussing each of the factors delineated in 20 C.F.R. §§ 404.1527(c), 416.927(c) when considering Dr. Choudhary's medical source statement. The ALJ was not required to do so. See **Bense v. Colvin**, 2015 WL 5675238, *16 (E.D. Mo. Sept. 25, 2015); **Molnar v. Colvin**, 2013 WL 3929645, *2 (E.D. Mo. July 29, 2013).

### Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this <u>24th</u> day of November, 2015.